ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ANGELA L. SANNEMAN (Cal. Bar No.: 240418)
Assistant United States Attorney
OCDETF Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0626
     Facsimile: (213) 894-0142
     E-mail:    angela.sanneman@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>SAMUEL JONES III,<br><br>  Defendant. | No. 09-501-RHW<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT SAMUEL JONES III<br><br>Hearing Date: 6/22/11<br>Hearing Time: 8:30 am |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorney Angela L. Sanneman, hereby files its sentencing position relating to defendant SAMUEL JONES III.

The government's position regarding sentencing is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Report, and any other

//

//

evidence or argument that the Court may wish to consider at the time of sentencing.

DATED: May 26, 2011

Respectfully submitted,
ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


          /s/
ANGELA L. SANNEMAN
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

The government agrees that the base offense level set forth in defendant's Presentence Investigation Report ("PSR"), a level 34, corresponds with the drug quantity applicable in this case. Pursuant to the plea agreement, however, the government is recommending a minor role reduction, which under United States Sentencing Guidelines ("USSG") § 2D1.1(3), results in a base offense level of 31 and an additional two-level reduction under USSG § 3B1.2(b).  The government also concurs with the three-level reduction for acceptance of responsibility set forth in the PSR.  The government also agrees with the Criminal History calculation in the PSR; namely, a criminal history category of I. Pursuant to the plea agreement, the government also recommends a four-level <u>Booker</u> variance.  An additional two-level reduction is also appropriate because defendant has satisfied the safety valve criteria.  If the Court accepts these variances and reductions, the resulting offense level would be 20 and the Sentencing Guidelines range would be 33-41 months.  The government recommends a sentence at the low-end of this Guidelines range, namely 33 months.

**II.   FACTUAL BACKGROUND**

   **A.   April 24, 2008 Meeting**

Defendant conspired with co-defendant Thomas Cataloni to purchase 10,000 80-milligram oxycodone pills from a drug supplier who was, in fact, an undercover Drug Enforcement Administration ("DEA") agent (the "UC").  Defendant and co-defendant Cataloni met with the UC on April 24, 2008, to discuss the purchase of

oxycodone.  During that meeting, defendant discussed oxycodone and the pending deal in detail.[1]  For example, defendant discussed the milligrams of the tablets:

```
UC:       But ah, I mean I was checking out - you guys
          wanted the oxy right? The…

Cataloni: Yeah, yeah

UC:       OC?

Cataloni: What's up with that?

UC:       What kind of numbers you looking at cause
          they, they got something right now.

Jones:    Eighties or forties?

UC:       Eighty mils, eighty m g's

Cataloni: Right now if I can get em in my hands for
          around ten, Ill be able to, I'll be able to…
          crush them, you know? (U/I).
```

[Exh. A at 5-6.]

Defendant also discussed the color of the tablets, correcting the UC when the UC (accidentally) described the pill color inaccurately:

```
UC:       However you need to do they but they wanna a
          number like I can go back so they can work
          with it, like what are we looking about,
          fifteen?  fifteen to..

Cataloni: What do you mean, on each one?

UC:       Yeah like what are you looking to… they want
          to know what kind of numbers they want
          because they want to crunch the numbers
          themselves. You know what I mean? The
```

---

[1] Attached as Exhibits A and B hereto are the draft transcripts from which the following quotes were taken.  These draft transcripts were produced in discovery.  Before the filing of this document, the case agents listened again to these excerpts on the recordings and made some minor, non-substantive revisions to the excerpts that appear in this brief so that they could reflect as accurately as possible what was stated on the recordings.

4

|   |   |   |
|---|---|---|
| | | quantity is not a problem they can get you as much as you want but it's all, it's the Mexican kind, so you know what Im sayin? It's not coming.... |
| | Jones: | So it's not green? |
| | UC: | It's going to be the white... but its gonna be the eighties that are made in Mexico. So I mean, you know, like you look at the pharmaceutical books or whatever you can tell like what countries they come from... |
| | Cataloni: | Right |
| | Jones: | Do they look the same though? |
| | UC: | Yeah they look... they look... |
| | Jones: | Exactly the same? |
| | UC: | Exactly the same dude, there's no ... because they don't give a fuck in regulations down there so you know but you can pass em here no ones gonna know the difference you know. The guy, I'm telling you because I know you guys so you know you guys know what you're getting so if someone does say anything, but its got the same... I mean, bottom line its fucking pharmaceutical heroin. |
| | Cataloni: | Right |
| | Jones: | Right |

--------------------

| | | |
|---|---|---|
| | Jones: | You said that the Oxys are the same exact color, they look the exact same. If you put one and one they look the same. |
| | UC: | If you put one from the Mexican side, because they realized they weren't moving as well, so whoever they dealt with down there fucking moved it |
| | Cataloni: | Must have changed it up. |
| | UC: | So you know. I mean its, its legit. You can take |
| | Jones: | It looks the same. |
| | UC: | y-yeah I mean as far as you know, everything like exactly... |

5

| | | |
|---|---|---|
| 1 | Cataloni: | Metrically? |
| 2 | UC: | Yeah, It's gonna look like an exact |
| 3 | Jones: | Right |
| 4 | UC: | But, I mean, if you take it to a fucking chemist or something I'm sure there gonna be able to say hey, this is not fucking made here |
| 7 | Jones: | Right, but it's the same? It's the same shit. |
| 8 | UC: | To you and me, it looks the same. |
| 9 | Cataloni: | If it looks the same and does the same thing, it doesn't matter. |
| 10 | Jones: | …and does the same thing, that's all we care. |
| 11 | UC: | It's just like the fucking E-tickets. Man if I gave you tweety this week next week I show up with the fucking green buddah. |
| 13 | Jones: | Right |

[Exh. A at 6; 34-35.]

Defendant also discussed the price he wanted to pay for these oxycodone pills.

| | | |
|---|---|---|
| | Cataloni: | Well I mean I could say fairly, to say I could… I mean on a realistic level I could take like probably about five thousand a week maybe, you know? |
| 20 | UC: | That's fine. But I mean, what, what, what range are you looking at? |
| 22 | Cataloni: | Like price? |
| 23 | UC: | Yeah that's what they wanna… |
| 24 | Cataloni: | I mean, anywhere between like ten, fifteen would be like the way way way top you know? |
| 25 | UC: | Yeah |
| 26 | Cataloni: | Ten would be ideal, I would be able to crush them so fast you know? Cause then I could wholesale them cause that's what I want to do. I want…(U/I) |
| 28 | Jones: | Because fifteen you could find it, pretty |

6

|   |   |   |
|---|---|---|
| 1 |   | much.  Fifteen, but it's not the, maybe not the quantity, but you could definitely find it for fifteen. |
| 2 |   |   |
| 3 | Cataloni: | Yeah cause me and him we've been searching. We've been searching fucking high and low for everything and we've been coming across things here and there but its never like, you know… |
| 4 |   |   |
| 5 |   |   |
| 6 | Jones: | Consistent… Like people (U/I) |
| 7 | Cataloni: | The consistency that we're looking for. |
| 8 | -------------- |   |
| 9 | UC: | You got anybody that can finance? I mean is there anybody that can... |
| 10 |   |   |
| 11 | Cataloni: | The biggest financer I had took that fucking big whack. You know? So he's not really even interested in… you know what I mean? I mean he's… he just… he just assumed. |
| 12 |   |   |
| 13 | Jones: | I think if you guys had the transportation this time it would be better. |
| 14 |   |   |
| 15 | UC: | Yeah… |
| 16 | Jones: | Because they already, he's already shown that he can bring out here. If its there, then he can get rid of it. It's just, like he said, it's just coming up with the capital right now is going to be difficult. |
| 17 |   |   |
| 18 |   |   |
| 19 | Cataloni: | Absolutely |
| 20 | UC: | How about your Hollywood backers? You got anybody that…? |
| 21 | Jones: | I mean I could look into it.  You know, that's why I came to meet today. |
| 22 |   |   |
| 23 | -------------------- |   |
| 24 | Jones: | So what do they want? Wait, what do they? Ok, Let's say they give us the fifty OC's right? With that ticket… what are they gonna want on top of that.  For that…for that ninety or whatever. |
| 25 |   |   |
| 26 |   |   |
| 27 | UC: | You work that off then whenever… we developed a good faith relationship. |
| 28 | Jones: | So they'll let us work that off whenever… |

| | | |
|---|---|---|
| 1 | UC: | Yeah! Exactly! |
| 2 | Jones: | All they want us to do is buy something right now. |
| 3 | Cataloni: | Right. |
| 4 | UC: | They want us to set up a deal where they get their money and then we can come back and say, hey there doing this and you know break it off, fucking, here's 5 thousand for that, work it off, I don't give a shit you can do a payment plan for the next 10 years cause, you know, bottom line is, here's the benefit that I'm selling to them, you got the Hollywood connections… you can open up an angle, you know, because these guys are fucking all be it, there fucking fascinated by fucking actors and fucking actresses. |
| 11 | Jones: | Right |
| 12 | UC: | Cause they got all the shit they… yeah |
| 13 | Cataloni: | Of course, between us we know everybody… |
| 14 | Jones: | Right |
| 15 | Cataloni: | We know everybody |
| 16 | UC: | And that's the thing man, cause then we come out there and you know I can be your guy, you set em up and you know what you can bring em and you just fucking screen them, make sure there not fucking, you know |
| 19 | Jones: | Right |
| 20 | Cataloni: | Of course. |
| 21 | ------------------ | |
| 22 | Jones: | What he's saying is as long as we come up with money for the first time, even if we just get an extra five, ten, he says as long as it takes us ten years, dude, that… that ninety is like ninety cents to them. |

[Exh. A at 7; 11; 21-22; 27.]

Defendant also discussed obtaining cocaine and marijuana from the UC:

| | | |
|---|---|---|
| 28 | Jones: | What's the ticket, what's the ticket on on uhhhh the on the |

8

| | | |
|---|---|---|
| 1 | UC: | On the E's? |
| 2 | Jones: | The key's |
| 3 | UC: | Oh keys? Right now its sixteen |
| 4 | Jones: | Sixteen? |
| 5 | UC: | Wholesale but dude it's about ninety percent cotton you know what I'm saying? |
| 6 | Jones: | Mmmm hmmm |
| 7 | UC: | Ninety percent purity. Its fucking, it's phenomenal. |
| 9 | Jones: | Is there a minimum? We have to figure that. |
| 10 | UC: | It depends on how much you want to do. |
| 11 | Jones: | See see, on the oz's, we got the market for that right now. |
| 12 | Cataloni: | A hundred percent. |
| 13-15 | Jones: | But those, that, it would have to be something to start up, but I know people, but it would have to be something to get started up, you know what I mean? |
| 16-17 | Cataloni: | Well that's what I'm saying we can work things up, I mean, dude… |

--------------

| | | |
|---|---|---|
| 19-20 | Jones: | You think we should just start with those… do that good faith thing, start with those, get those, pay for those, come back again, and then if we… let's say we do those five thousand and let's say were back fast… right? |
| 22-23 | UC: | However you want to do it. Because, here's the thing, you do the five and say then you turn those. |
| 24 | Jones: | And when do the green shirts start coming into play after that…. |
| 25-26 | UC: | It should be start coming.. the outdoor stuff should be starting up ah, you know probably, you know, in another month I think roughly. |

[Exh. A at 24; 30.]

9

1    Defendant also instructs the UC to alternate his cell phone
2 in order to avoid law enforcement detection:

3    Cataloni: Well that's another thing, we need to
              establish a communication link too,
4
     Jones:    Better, yeah…
5
     Cataloni: That's more uh you know so we can at least
6              feel a little comfortable talking.

7    UC:       Yeah this line… That's why I got this. The
               only person is you and other guy I'm talking
8              to on this line man.  And once (U/I) you know
               like you changed your numbers a lot.  I just
9              keep ah, you know and if got another phone,
               like I got my other work phone here you know,
10             fuckin' ah, and I got another and another one
               here so I mean basically, it's, I keep them
11             separate so you know, it looks like, hey lose
               that phone you know I lose it you know?  Not
12             ah…

13   Jones:    Sometimes, you should change out maybe like
               once a month because they can get on those
14             things, you know?

15 [Exh. A at 31.]

16   **B. Subsequent Negotiations**

17    Following this meeting, on June 30, 2008, defendant and
18 Cataloni continued to negotiate the purchase of oxycodone with
19 the UC.  On June 30, 2008, defendant indicated that he felt he
20 and Cataloni could distribute 10,000 oxycodone pills ("I know we
21 can do ten"), but since they had to pay up front, they only
22 wanted to purchase 5,000 tablets.  [PSR ¶ 13; Exh. B at 31.]  The
23 UC then offered to sell defendant and Cataloni a total of 10,000
24 tablets for which 5,000 tablets would be paid up front and 5,000
25 tablets would be provided on consignment. [PSR ¶ 13.]

26    On July 23, 2008, Cataloni, on behalf of himself and
27 defendant, agreed to purchase approximately 10,000 80-milligram
28 oxycodone tablets from the UC at a price of $14 per tablet with

10

$75,000 of the purchase price up front. [PSR ¶ 14.]

### C. The Oxycodone Deal

On July 24, 2008, defendant gave Cataloni approximately $9,000 as part of the $75,000 down payment. [PSR ¶ 15.] On July 28, 2009, defendant, Cataloni, and co-defendant Collins met at Collins' house where defendant provided the rest of defendant's contribution, for a total of $37,500. [PSR ¶ 16.]

Defendant did not attend the narcotics deal. Instead, Cataloni and Collins met the UC. Cataloni and Collins brought approximately $75,000, including defendant's contribution, to Glendale, California, for the purpose of purchasing 10,000 oxycodone tablets from the UC. The UC provided them with 10,000 placebo tablets.

### D. The Previous Marijuana Deal

In August 2007, approximately one year prior to this oxycodone deal, Cataloni purchased approximately 266 kilograms of marijuana from the UC, which he intended to distribute on the east coast. The DEA seized the marijuana before Cataloni's transporter left Los Angeles. Because part of the marijuana was "fronted" to Cataloni, he owed the UC approximately $90,000. The UC contacted Cataloni after the marijuana seizure to inquire about what had happened and to inquire about repayment of the debt so that Cataloni would not become suspicious or otherwise realize that the UC was responsible for the seizure. While the UC maintained his role as a narcotics trafficker, he did not threaten to harm Cataloni if Cataloni did not repay the debt. The evidence indicates that Cataloni was concerned about repaying the drug debt because the UC would not agree to front him more

drugs, not because he felt his life was in danger.

**III. DEFENDANT'S EXPLANATION**

Both in his papers and during his safety valve proffer, defendant stated that he gave Cataloni the money because Cataloni told him that he (Cataloni) was in danger and needed to pay back the UC for the money Cataloni owed on the previous marijuana deal. The evidence, however, indicates otherwise. For instance, it is unclear why defendant didn't simply give Cataloni the money he requested to pay off the debt as opposed to partnering with him in a drug deal. This question was also raised by the Probation Officer in the Recommendation Letter. [Rec. Ltr. at 4.] When confronted with this question during his safety valve proffer, defendant explained that he could not afford to give Cataloni more than the money he provided, and Cataloni did not have anything more than the money he contributed to the deal. Defendant stated that to pursue another narcotics deal was the only way to get Cataloni out of debt. From the asset analysis in the PSR, however, it appears that defendant could have afforded to give Cataloni more than the $37,500 defendant provided. In fact, he currently has significant assets, over $200,000 of which is in cash. [PSR ¶ 78.] Instead, though, defendant agreed to partner with Cataloni to buy more drugs, some of which were going to be fronted. He, in essence, agreed to get Cataloni further in debt. While the government cannot definitively refute defendant's explanation, the government has significant reservations about his claims in light of the other reasonable alternative, which was to just give Cataloni money to pay the debt.

1     Also troubling is the fact that defendant appeared so
2 knowledgeable about oxycodone at the April 24 meeting.  As set
3 forth above, defendant inquired about the milligram dosage of the
4 pills, asking whether they would be 80 or 40 milligrams, both of
5 which are dosages typical for oxycodone. [Exh. A at 5-6.]  When
6 Cataloni was attempting to negotiate a $10-per-pill purchase
7 price, defendant noted that he could readily purchase pills for
8 $15 each ("Fifteen bucks it's not the, maybe not the quantity but
9 you could definitely find it for fifteen.")  [Exh. A at 7.]
10 Defendant also quizzed the UC when he said that the oxycodone
11 pills were going to be white.  [Exh. A at 6.]  Defendant was
12 surprised to hear that they were not green (their typical color)
13 and indicated that he wanted the pills to look identical to those
14 manufactured in the United States.  <u>Id.</u>  In reality, the UC had
15 mistakenly stated that the pills were white; a mistake that
16 defendant was familiar enough with oxycodone to catch.  Defendant
17 also inquired about purchasing other narcotics, including cocaine
18 ("what's the ticket on the keys") and marijuana ("when does the
19 green shirts start coming into play.")  [Exh. A at 30.]  Finally,
20 defendant even instructed the UC to avoid law enforcement
21 detection by alternating his cell phone ("Sometimes, you should
22 change that out maybe like once a month because they can get on
23 those things, you know?").  [Exh. A at 31.]
24     It is unclear why defendant went to this meeting at all if
25 he was simply giving money to Cataloni.  Moreover, as noted
26 above, he spoke quite knowledgeably about oxycodone, inquired
27 about obtaining other drugs, and instructed the UC on how to
28 avoid law enforcement interception.  During his safety valve

proffer, however, defendant explained that Cataloni was adamant that defendant attend the meeting because the UC was particularly interested in any ability that defendant might have to distribute oxycodone in Hollywood. Thus, here again, defendant was doing a favor for a friend. During his safety valve proffer, defendant explained that his apparent knowledge of oxycodone at the April 24 meting was a result of studying oxycodone with Cataloni in preparation for the meeting so that he could sound knowledgeable. His explanation, in a nutshell, was that his statements at the meeting were all an act.

Inconsistent with defendant's explanation is that defendant agreed to continue with the deal when he heard the UC say that Cataloni could take 10 years to pay the marijuana debt ("I don't give a shit you can do a payment plan for the next 10 years cause . . . you got the Hollywood connections."). [Exh. A at 21-22.] Regardless of what Cataloni had told defendant prior to the meeting, defendant heard from the source that there was no immediate need for Cataloni to repay the debt. Indeed, defendant even said as much at the meeting, explaining to Cataloni that "What [the UC is] saying is as long as we come up with money for the first time, even if we just get an extra five, ten, he says as long as it takes us ten years, dude, that… that ninety is like ninety cents to them.") [Exh. A at 27.]

Unfortunately, neither the government nor this Court will ever know defendant's true motivations. The facts of the case, however, cast doubt on defendant's explanation.

**IV. ROLE ANALYSIS**

Pursuant to the plea agreement, the government recommends

14

that defendant receive an adjustment for his role in this offense. As discussed above, defendant argues that he was simply helping a friend in debt, which is why he provided Cataloni with the money to purchase the oxycodone pills. (Def's Brf at 2.) During his safety valve proffer, defendant explained to the government that he was not going to distribute any pills; rather, Cataloni was going to distribute all of oxycodone pills on the East Coast. He also stated that he was not concerned about making a profit on the transaction. The evidence indicates, however, that defendant and Cataloni were partners in this transaction and that they were each going to distribute some of the pills. Under either scenario, a minor role adjustment is appropriate. If defendant truly did not intend to distribute any of the pills, did not expect to make any profit, and was merely helping a friend who he thought was in need, then he certainly played a minor role in the drug conspiracy and is deserving of an adjustment. If he instead intended to distribute only a portion of the pills, a minor role adjustment is also applicable because the Guidelines range to which he has pled guilty reflects the entire amount of oxycodone – 10,0000 pills.

**V. ANALYSIS OF THE SECTION 3553(a) FACTORS**

The government believes that the factors set forth in 18 U.S.C. § 3553(a) would be fulfilled by a sentence at the low-end of the Sentencing Guidelines range, specifically 33 months.

**A.    18 U.S.C. §§ 3553(a)(1), (2)**

18 U.S.C. § 3553(a)(1) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of defendant. 18 U.S.C. § 3553(a)(2) requires

the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of defendant, and to provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

### i. A 33-month Sentence is Appropriate In Light of the Seriousness of This Offense.

Regardless of whether defendant partnered with Cataloni and intended to distribute a portion of the oxycodone pills or was simply funding part of Cataloni's drug deal, the crime is sufficiently serious to warrant a 33-month sentence. Defendant facilitated the purchase of 10,000 oxycodone pills, which even according to him, he knew were going to be redistributed. Oxycodone is a highly addictive drug that has become increasingly popular. It is often referred to as pharmaceutical heroin, a term which the UC used during the April 24 meeting, to which defendant responded with an affirming "right." [Exh. A at 34-35.] Considering the amount of pills at issue, the amount of money that defendant contributed, and defendant's awareness of the dangerous nature of oxycodone, a 33-month sentence is appropriate here.

### ii. A 33-month Sentence is Needed to Deter This Criminal Activity

Moreover, the sentence is justified as a deterrent. Under section 3553(a) the Court must consider the need for the sentence to adequately deter future crime. Whether defendant partnered

with Cataloni and intended to participate in the distribution or was simply funding part of Cataloni's drug deal, a 33-month sentence is also necessary to deter future crime. As explained at length in defendant's sentencing paper, defendant has had many opportunities in life – from a determined mother who found a way to send him to good schools to a successful acting career. As also evidenced by his sentencing brief, he has numerous individuals in his life who care deeply for him. Yet despite this support system, all of these opportunities, and so much to lose, defendant still agreed to participate in a drug deal.

On the other hand, defendant has a promising acting career that has suffered as a result of his actions. He also continues to volunteer his time to worthwhile causes and appears sincerely remorseful for his role in this crime. In light of these factors and his explanation for entering into the narcotics deal in the first place, the government recommends a four-level <u>Booker</u> variance.

Nevertheless, some term of imprisonment is necessary to adequately deter defendant. It is also necessary to promote respect for the law and to afford adequate deterrence to criminal conduct generally.

### B.   18 U.S.C. § 3553(a)(6)

18 U.S.C. § 3553(a)(6) requires the Court to minimize sentencing disparity among similarly situated defendants. Using the Sentencing Guidelines to sentence defendant accomplishes this goal. Variation from the Guidelines range necessarily increases sentencing disparity among similarly situated defendants. Nevertheless, this case presents unique issues that, as explained

above, warrant a Booker variance.

    **C. THE REMAINING 3553(a) FACTORS**

18 U.S.C. § 3553(a)(3) requires the Court to consider the kinds of sentences available. Incarceration is appropriate given the nature of defendant's offense.

18 U.S.C. § 3553(a)(4) & (5) now merely require the Court to take the Sentencing Guidelines as "advisory." Nevertheless, for the reasons stated above, a low-end Guidelines sentence is appropriate here.

Finally, 18 U.S.C. § 3553(a)(7) requires the Court to consider restitution. Restitution is not at issue in this case.

**VI. CONCLUSION**

For the foregoing reasons, the factors set forth in 18 U.S.C. § 3553(a) support the imposition of a 33-month term of imprisonment and a three-year term of supervised release.

DATED: May 26, 2011          Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

    /s/
ANGELA L. SANNEMAN
Assistant United States Attorney
OCDETF Section

Attorneys for Plaintiff
United States of America